UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | File No. 1:11-cr-127-jgm-1 |
| | : | |
| SHERRY ROEBUCK, | : | |
| Defendant. | : | |
| | : | |

DECISION ON DEFENDANT'S RULE 29(c) MOTION
(Doc. 50.)

I.  Introduction

Defendant Sherry Roebuck moves under Federal Rule of Civil Procedure 29(c) for judgment of acquittal on counts one and two of the indictment (Doc. 1) and requests that the Court vacate the guilty verdicts on both counts, dismissing them with prejudice. (Doc. 50.) The government opposes the motion. (Doc. 51.)

For the following reasons, the motion for judgment of acquittal is DENIED.

II. Background

Sherry Roebuck was found guilty on July 26, 2012 on both counts of the indictment following a three-day jury trial.

The indictment's first count charged Roebuck, as an agent of both the Algiers Fire District #1 ("Fire District") and the Town of Guilford ("Guilford"), with embezzling money from municipalities receiving federal funds, an offense under 18 U.S.C. § 666(a)(1)(A). (Doc. 1 at ¶ 7.) As treasurer for the Fire District, Roebuck had access and control over its checkbook and accounts. Id. at ¶ 2. She was charged with embezzling approximately $82,000 by writing checks to herself

from late 2007 to early 2011.  Id. at ¶ 5.  The Fire District is a municipality that supplies sewer services to some residents of Guilford.  Id. at ¶ 1.

At trial, the evidence clearly established Roebuck was employed by the Fire District.  While Guilford received federal funds in 2009 and 2011, the Fire District did not.  The indictment, however, charged Roebuck as an agent of both of these municipalities.  Id. at ¶ 7.

The second count of the indictment charged Roebuck with mail fraud, alleging that the "Algiers Fire District #1 used the United States Postal Service to mail quarterly sewer bills to members and received payments from members through the U.S. mail."  Id. at ¶ 3.  Furthermore, it charged Roebuck with devising a scheme to defraud and "obtain money by means of materially false and fraudulent pretenses, representations and promises," and "for the purpose of executing such scheme and artifice, knowingly caused to be delivered by the United States Postal Service checks from Algiers Fire District #1 members" as payment for sewer services.  Id. at ¶ 9.  Roebuck deposited these checks and misappropriate the proceeds.  Id.  At trial, the evidence established that Roebuck was trained to send invoices to Fire District members and to receive checks or other funds and deposit them into the Fire District's account.  The jury heard undisputed testimony that Roebuck mailed the invoices and picked up the received checks at the Fire District's mailbox.  There was no evidence, and the government did not contend, that the mailed invoices to Fire District members or the mailed funds received were themselves fraudulent or induced by false statements or representations.

III. Discussion

    A. Standard

A defendant who challenges the sufficiency of the evidence underlying a conviction bears a very heavy burden.  United States v. Amiel, 95 F.3d 135, 141 (2d Cir. 1996).  A court must view the

evidence in the light most favorable to the government and credit inferences in its favor. United States v. Chavez, 549 F.3d 119, 124 (2d Cir. 2008). If "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt," the conviction must stand. United States v. Best, 219 F.3d 192, 200 (2d Cir. 2000) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)) (internal quotation marks omitted).

      B.      Federal Program Embezzlement

The jury convicted Roebuck of embezzling funds from the Fire District, a municipality created by Guilford's Selectboard under Vermont Statutes Annotated title 1, section 126. While it was undisputed that Roebuck was employed by the Fire District and not Guilford, the jury was instructed it could find Roebuck guilty of federal program embezzlement under 18 U.S.C. § 666 if it found, in addition to the other elements, that she was an agent of the Fire District and Guilford. The evidence showed that, during the relevant period, the Town, but not the Fire District, received substantial federal funds. In moving for acquittal, Roebuck asserts the government produced insufficient evidence at trial of her status as an agent of Guilford. (Doc. 50 at 2.)

Section 666 serves "to protect the integrity of the vast sums of money distributed through federal programs." United States v. Brunshtein, 344 F.3d 91, 97 (2d Cir. 2003). In general, the courts have "broadly interpreted the behavior proscribed by [it]." Id. Section 666(d)(1) defines "agent" as "a person authorized to act on behalf of another person or a government and, in the case of an organization or government, includes a servant or employee, and a partner, director, officer, manager, and representative." 18 U.S.C. § 666(d)(1). The agent need not have control or power of disbursement over federal funds. United States v. Vitillo, 490 F.3d 314, 322-23 (3d Cir. 2007). Nor must the organization receiving those funds employ them. United States v. Sotomayor-Vasquez, 249 F.3d 1, 8 (1st Cir. 2001). Rather, "agent" includes "persons who act as directors, managers, or

3

representatives of covered organizations, even if those persons are not actually employed by the organizations from which they embezzled." Id.

A defendant may serve as an agent of more than one organization under this expansive definition. See United States v. Pretty, 98 F.3d 1213, 1218-19 (10th Cir. 1996). If one organization supervises another, for example, agents of the supervised organization may also act as agents of the supervising organization. United States v. Moeller, 987 F.2d 1134, 1136-38 (5th Cir. 1993), is particularly instructive. There, the Texas Federal Inspection Service (TFIS) did not receive federal funds, while the Texas Department of Agriculture (TDA) did. Id. at 1136-37. In characterizing employees of the TFIS as agents of the TDA, the Tenth Circuit examined a cooperative agreement between these organizations. Id. at 1137-38. The agreement required TFIS to perform discretionary functions on behalf of the TDA, to enforce regulations promulgated by the TDA, and to remit any funds collected through its regulatory functions to the state treasury. Id. at 1138. If the agreement terminated, funds held by the TFIS would revert back to the TDA, provided no successor inspection service was appointed. Id. Relying on the relationship between these organizations, the Tenth Circuit determined that TFIS employees, as they performed their functions for the TFIS, were also agents of the TDA. Id. at 1137-38.

A rational juror could have found that Roebuck, through her position with the Fire District, also acted as an agent of Guilford. The jury heard evidence that Guilford exercised at least some supervisory control over the Fire District. Title 20, section 2481 of the Vermont Statutes Annotated governs the creation of fire districts and provides that a town selectboard will "establish such proposed fire district and define its limits." Vt. Stat. Ann. tit. 20, § 2481(a). Vermont Statutes also provides that a town plays an ongoing supervisory role over a fire district, granting it the power to fill vacancies on the prudential committee governing the fire district and to change the district's

4

limits. Vt. Stat. Ann. tit. 20, §§ 2481, 2485. Each fire district must deliver an annual statement of taxes to the town clerk. Vt. Stat. Ann. tit. 32, § 3461. Furthermore, in the wake of the embezzlement here, Guilford considered dissolving the Fire District and merging the municipalities, with Guilford assuming all of the Fire District's funds and responsibilities. The possibility of such a merger is additional evidence of Guilford's supervisory role. Viewing the evidence in the light most favorable to the government, a rational juror could have found that Roebuck was an agent of Guilford.

    C.    Mail Fraud

The jury also convicted Roebuck of mail fraud. The jury instructions required the government to prove beyond a reasonable doubt that Roebuck made false representations in connection with a scheme or artifice to defraud and that she used the mails to carry out the fraudulent scheme. The evidence established that Roebuck, as treasurer, sent invoices to Fire District members by mail and received checks or other funds in the mail. There was no evidence the invoice mailings or payments received were themselves improper.

Roebuck asserts that this evidence is insufficient to satisfy the mailing element of the federal mail fraud statute, 18 U.S.C. § 1341. (Doc. 50 at 4-8.) She advances two arguments in support: first, the fraudulent scheme here is insufficiently related to the mailings in question; and, second, she was required to issue the invoices and cannot be held criminally liable for doing so under Parr v. United States, 363 U.S. 370 (1960). Id. The government responds that, without the revenue generated by these invoices, Roebuck would have had no funds to embezzle and that the invoices permitted Roebuck to perpetuate the scheme. (Doc. 51 at 11.) The government also argues that Parr is limited to its unique facts and that no provision of Vermont law required the Fire District to mail out quarterly invoices. Id. at 10-11. The government suggests that it is relying solely on the

5

payments received from members, rather than the sewage assessments mailed to members, for the required jurisdictional mailing. Id. at 11.

A mailing furthers a fraudulent scheme, as required by section 1341, if it is "incident[al] to an essential part of the scheme" or "a step in [the] plot." United States v. Tocco, 135 F.3d 116, 124 (2d Cir. 1998) (internal citations and quotation marks omitted). An innocent or routine mailing containing no false information may satisfy this requirement, provided it is essential to the perpetuation of the scheme. Schmuck v. United States, 489 U.S. 705, 713-14 (1989). The evidence at trial established that Roebuck mailed invoices to Fire District members and members remitted payments through the mail. Roebuck, in turn, misappropriated these payments by writing checks to herself from the fund where she deposited them. Roebuck did so for over three years. She continued to invoice members and receive payments from them during this period. Viewing this evidence in the light most favorable to the government, a rational juror could have found that these mailings were essential to Roebuck's embezzlement scheme. See United States v. Morales-Rodriguez, 467 F.3d 1, 7 (1st Cir. 2006), abrogated on other grounds, Regalado Cuellar v. United States, 553 U.S. 550, 556 n.1 (2008) (refusing to acquit labor union officials who embezzled membership dues collected through mail and used promotional mailings to increase membership); United States v. Boyd, 606 F.2d 792, 794 (8th Cir. 1979) (sustaining conviction of director of economic development agency who entered kickback agreements for the disbursement of grant funds that he had obtained through the mail).

Significantly, the embezzlement scheme here was not "a one-shot affair." United States v. Cacho-Bonilla, 404 F.3d 84, 91 (1st Cir. 2005). Rather, Roebuck embezzled funds on numerous instances over a significant period of time. Through the continued mailing of invoices and receipt of payments during this period, Roebuck perpetuated the scheme. A juror could reasonably infer

that these incoming payments prevented the Fire District's funds from depleting more dramatically, thereby "faciliat[ing] concealment of the scheme" by obscuring each misappropriation. United States v. Lane, 474 U.S. 438, 453 (1986) (internal quotation marks omitted). Furthermore, had Roebuck stopped issuing invoices and collecting payments following the first embezzlement, a rational juror could have determined that authorities would have detected the embezzlements sooner. There is a reasonable inference she delayed detection by otherwise performing her job as she did before the embezzlement scheme commenced. The Supreme Court has made it clear that mailings may further a fraudulent scheme if they "were designed to lull the victims into a false sense of security, postpone their ultimate complaint to the authorities, and therefore make the apprehension of the defendants less likely than if no mailings had taken place." United States v. Maze, 414 U.S. 395, 403 (1974). Based on the evidence at trial, a rational juror could have concluded so.

There is also a reasonable inference that the mailings permitted Roebuck to continue to access the Fire District's funds for over three years. Invoicing members and collecting payments was an essential function of her position as treasurer. Had she stopped performing this function, Fire District members may have denied her access to the funds by removing her from office. The Supreme Court addressed mailings that maintain a relationship on which a fraud depends in Schmuck v. United States, 489 U.S. 705 (1989). A used-car distributor there increased the sale price of cars by tampering with their odometers. Id. at 707. He then sold them to car dealers who, upon resale to customers, mailed title registration papers to the state as required by law. Id. In sustaining his mail fraud conviction, the Supreme Court emphasized that his scheme "was not a 'one-shot' operation . . . [but] an ongoing fraudulent venture." Id. at 711. The successful perpetuation of his scheme "depended upon his continued harmonious relations with . . . [the] dealers," which in turn

7

required the transfer of title to customers.  Id.  The perpetuation of Roebuck's scheme likewise depended on her continued relations with the officers and members of the Fire District.  Indeed, Vermont law requires fire districts to elect treasurers annually, see 20 V.S.A. § 2485, making her continued embezzlement of funds dependent on her reelection.

Roebuck relies heavily on Parr v. United States, 363 U.S. 370 (1960) in moving for acquittal. (Doc. 50 at 5-7.)  Her reliance is not entirely misplaced, as the fraudulent scheme there bears factual similarities to the one here.  The defendants in Parr misappropriated taxes collected on behalf a school district in Texas.  Parr, 363 U.S. at 387.  The defendants caused the mailing of tax statements to property owners and deposited the checks and money received in payment.  Id. at 388-89. Because (a) state law compelled the defendants to collect taxes; (b) the circumstances only permitted the collection of taxes through the mail; (c) the defendants had not assessed excessive or "padded" taxes; and (d) the tax statements mailed included no false pretense or misrepresentations, the Supreme Court held that the government had not satisfied the jurisdictional element for mail fraud. Id. at 388, 91.  The Court carefully limited this holding[1] to the "particular circumstances of [the] case."  Id. at 391.  In reaching it, the Court reasoned that "it cannot be said that mailings . . . made under the imperative command of duty imposed by state law are criminal under the federal mail fraud statute, even though some of those who are so required to do the mailing . . . plan to steal" the resulting revenue.  Id.

At first blush, Parr is appealing.  The defendants in Parr embezzled school district funds raised through the mail.  Likewise, in her capacity as treasurer of the Fire District, Roebuck

---

[1] Parr also stands for a second holding.  In addition to causing the mailing of tax statements and receipts, several of the defendants had used a credit card issued by the school district for personal expenses.  Parr, 363 U.S. at 392.  The school district was then billed for these expenses through the mail.  Id. at 392-93.  Because the defendants' scheme reached fruition before the mailing of these bills, Parr concluded that they did not further the scheme.  Id. at 393.

8

embezzled funds she had raised by mailing invoices to its members. Yet Parr is distinguishable for two reasons: first, the evidence failed to establish that Vermont law compelled Roebuck to mail the invoices; and, second, Schmuck's "perpetuation" theory was not before the Court in Parr.

The evidence did not establish that Vermont law compelled Roebuck to mail the invoices here.[2] She points to no provision of the Vermont Statutes compelling her to deliver them by postal mail. (Doc. 50 at 7-8.) Roebuck could have delivered the invoices by hand or posted the invoices publicly. In contrast, there was no question in Parr that state law required the defendants to use the mails to collect the district's taxes. Parr, 363 U.S. at 387-89. Geographic realities compelled the defendants to do so, as the school district collected its taxes "largely from nonresident property owners," including several oil companies. Id. at 388-89. The government had argued at trial that the defendants could not "collect these taxes . . . from taxpayers all over the State of Texas without the use of the United States mails." Id. The government in this case did not concede Roebuck had to use the postal mail to invoice Fire District members. Nor did the evidence establish that geographic realities compelled her to use the mail. Rather, there was evidence Roebuck billed Fire District members for the use of sewer services. Each member, then, owned a structure within the

---

[2] As the predicate mailings, the government's opposition relies on the payments mailed to the Fire District, rather than the invoices mailed to Fire District members. (Doc. 51 at 10-11.) This distinction lacks merit. Despite explicitly noting that "the great majority of [the checks received from taxpayers] were received in the mails," Parr drew no distinction between the mailing of tax statements and the receipt of checks in the mail. Parr, 363 U.S. at 379. Nor is the government correct in describing the indictment as only charging Roebuck with the receipt of the payments in the mail. (Doc. 51 at 11.) While the text of the indictment's mail fraud count only charges Roebuck with receiving payments from members, the count also "repeats and realleges paragraphs 1-5 of [the] indictment." (Doc. 1 at ¶ 8-9) The third paragraph charged that the Fire District "used the United States Postal Service to mail quarterly sewer bills to members and received payments through the U.S. mail." Id. at ¶ 3. Read as a whole, the indictment encompasses both the mailing of the invoices and the receipt of the payments from members. See 1 Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 125 (4th ed. 2012) (directing courts to "consider the indictment in its entirety . . . [and to] be guided by common sense and by practical rather than by technical considerations").

9

Fire District that received services, making it possible to deliver the invoices to these structures in person.  Roebuck did not act under the same legal compulsion as the defendants in Parr.

Even assuming Roebuck acted under such a compulsion, Parr is nevertheless inapplicable. While the fraudulent scheme there lasted over four years, the government in Parr did not assert that the mailings perpetuated the scheme by delaying its detection and providing the defendants with continued access to the funds.  Id. at 374, 385-86.  The government instead asserted, broadly, that mailings sent after the scheme to defraud commenced furthered it.  Id. at 385-86.  It also asserted that these mailings were fraudulent in and of themselves because the defendants had padded the tax bills.  Id. at 396.  There is no analysis in Parr about the effect these mailings had on the perpetuation of the scheme.  See Cacho-Bonilla, 404 F.3d at 91 (suggesting that Parr could have applied the perpetuation theory); United States v. Helmsley, 941 F.2d 71, 95 (2d Cir. 1991) (describing the scheme in Parr as "essentially one to steal funds that had been mailed, not to cause deception through the mails").  Furthermore, the perpetuation theory that the Supreme Court developed in Schmuck[3] postdates Parr.  To the extent these cases reach contradicting holdings, the Court will defer to the later case.

---

[3] In its analysis of Parr, Schmuck focuses on the credit card bills sent to the school district. Schmuck, 489 U.S. at 713.  A footnote in Schmuck distinguishes the mailing of tax documents, reasoning that those mailings were "the direct product of the school district's state constitutional duty to levy taxes and would have been made regardless of the defendants' fraudulent scheme," while the mailing of the title registration documents "were derivative of [the defendant's] scheme to sell 'doctored' cars and would not have occurred but for that scheme."  Id. at 713 n.7.  The evidence at trial here supported the conclusion that, except for her continued mailing of the invoices, Roebuck would have lost access to the Fire District's funds.  Roebuck hatched the embezzlement scheme on her own, without any assistance from the Fire District's other officers.  Instead of taking part in her scheme, these officers uncovered it.  In contrast, the defendants in Parr dominated the school district's board of trustees, making the scheme there less dependent on maintaining an appearance of propriety.  There is a reasonable inference Roebuck would not have continued to access the funds "but for" her mailing of the invoices.

IV. <u>Conclusion</u>

For the foregoing reasons, the defendant's motion for judgment of acquittal (Doc. 50) is DENIED.

SO ORDERED.

Dated at Brattleboro, in the District of Vermont, this 17th day of October, 2012.

<u>/s/ J. Garvan Murtha</u>
Honorable J. Garvan Murtha
United States District Judge